IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

TRACIE REAVIS,  )
    *pro se* Plaintiff,  )
    )
v.  )    Civil No. 3:13-cv-149 (HEH)
    )
CAROLYN W. COLVIN,  )
Acting Commissioner of Social Security,  )
    Defendant.  )
    )

## REPORT AND RECOMMENDATION

Tracie Reavis ("Plaintiff"), who proceeds *pro se*, commenced this action in March 2013,

seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the final decision of

Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") payments.  The Commissioner's decision was based on a

finding by an Administrative Law Judge ("ALJ") that Plaintiff was not disabled as defined by the

Social Security Act (the "Act") and applicable regulations.  This matter is before the Court for a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on Plaintiff's Motion for

Summary Judgment (ECF No. 13)[1] and Defendant's Motion for Summary Judgment (ECF No.

11).  The Court held oral argument on the matter on November 20, 2013.

For the reasons discussed below, it is the Court's recommendation that Plaintiff's Motion

---

[1]     Plaintiff's motion is styled "Motion to Dismiss and Response to Roseboro Notice."  "A document filed *pro se* is 'to be liberally construed.'"  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).  Although not filed as a Motion for Summary Judgment, Plaintiff asks the Court to "enter an order affirming a favorable decision on [her] behalf."  (Pl.'s Mem. at 1.)  Specifically, Plaintiff asks for the Court to review the Administrative Law Judge's decision that her impairments do not meet listing level severity.  (Pl.'s Mem. at 1.)  The Court, therefore, will treat Plaintiff's "Motion to Dismiss and Response to Roseboro Notice" as a motion for summary judgment.

for Summary Judgment (ECF No. 13) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and the final decision of the Commissioner be AFFIRMED.

## I. Background

Because Plaintiff challenges whether the ALJ erred in finding that Plaintiff's impairments were not severe enough to meet the listings and whether the ALJ erred in assigning the opinions of the treating physicians less than controlling weight, Plaintiff's educational and work history, medical history, non-treating state agency physicians' opinions, activities of daily living and testimony before the ALJ are summarized below.

### A. Plaintiff's Education and Work History

Plaintiff is a high school graduate who was 36 years old on the date of the ALJ's decision and 32 years old on her alleged disability onset date. (R. at 29, 214, 274.) She previously worked as an insurance agent, a corrections officer and as a manager at a fast food restaurant and at a retail store. (R. at 267.) Plaintiff has not worked since May of 2007. (R. at 19, 40, 267.)

### B. Plaintiff's Physical Disorders

On May 21, 2007, Dr. Talaat Maximous, M.D., examined Plaintiff, who complained of lower back pain. (R. at 395-96.) An x-ray revealed "narrowing of the disc spaces at L4-L5 and more at L5-S1 with arthritic changes at these two levels." (R. at 395.) Thereafter, on May 31, 2007, Plaintiff underwent an MRI procedure that revealed mild degenerative disc disease, with mild to moderate facet osteoarthritis at L4-L5 and mild facet osteoarthritis at L5-S1. (R. at 398.) The MRI further indicated mild lateral stenosis bilaterally, but did not show indications of central stenosis. (R. at 398.)

On June 13, 2007, Dr. James A. Nunley, M.D., examined Plaintiff who was complaining of pain in her left great toe. (R. at 387.) Plaintiff reported that she underwent surgery for a bone spur on her left great toe in 2004. (R. at 387.) Dr. Nunley indicated that Plaintiff had some tenderness in her left foot, possibly related to a small loose piece of bone. (R. at 389.) Dr. Nunley further reported that Plaintiff had a normal gait, normal motion in both of her ankles, no motor or sensory deficiencies and the ability to tiptoe walk, heel walk and perform single heel rise. (R. at 388-89.)

On June 20, 2007, Dr. Mervet Elassal, M.D., examined Plaintiff for lower back pain. (R. at 400.) Dr. Elassal indicated that Plaintiff walked with stiffness and an antalgic gait. (R. at 400.) Plaintiff displayed tenderness in her neck and back, as well as a decreased range of motion in her back. (R. at 400.) She had no muscle weakness or wasting in either her upper or lower extremities. (R. at 400.) Plaintiff demonstrated a positive straight-leg raising at seventy degrees of flexion bilaterally. (R. at 400.)

On July 2, 2007, Plaintiff complained of lower back pain to Dr. Maximous. (R. at 394.) Dr. Maximous reported that an EMG of Plaintiff displayed chronic L5 radiculopathy on the right. (R. at 394.) Dr. Maximous administered a paraspinal block to alleviate Plaintiff's discomfort. (R. at 394.)

On December 6, 2007, and December 17, 2007, Plaintiff went to the emergency room at the VCU Health System. (R. at 654, 671.) On both occasions, Plaintiff complained of back pain. (R. at 654, 671.) The December 17, 2007, emergency room report indicated that Plaintiff had back tenderness. (R. at 656.) Plaintiff, however, had a painless range of motion in her back

and a non-tender full range of motion in her extremities. (R. at 656.) Moreover, Plaintiff had

negative straight leg-raising tests for both of her legs. (R. at 656.)

On June 19, 2008, Plaintiff visited Lawrenceville Primary Care, complaining of pain in

her back and lower extremities. (R. at 607.) A nurse practitioner reported that Plaintiff exhibited

a positive straight leg-raise on the right and reduced reflexes in her lower extremities. (R. at

607.) Plaintiff walked with a normal gait and showed no lower back pain upon palpitation. (R.

at 607.)

On July 9, 2008, and August 8, 2008, Dr. Manuel Salazar, M.D., examined Plaintiff. (R.

at 447-52.) During both visits, Dr. Salazar reported that Plaintiff had generalized tenderness on

palpitation of her shoulders and arms. (R. at 448, 451.) Dr. Salazar also indicated that Plaintiff

had normal sensation, reflexes, muscle strength and muscle tone. (R. at 448, 451.) Moreover,

Plaintiff displayed a normal gait on both visits. (R. at 448, 451.)

On August 21, 2008, Plaintiff complained to Dr. Maximous that she was experiencing

pain at a level of ten on a scale of one to ten. (R. at 393.) Dr. Maximous reported that Plaintiff's

gait was normal and that she walked without using any assistive devices. (R. at 393.) Plaintiff

could perform a straight leg raise. (R. at 393.) Plaintiff experienced slight discomfort with right

hip rotational movement, but otherwise had a full range of motion. (R. at 393.) An x-ray of

Plaintiff's lumbar spine and pelvis revealed them to be completely normal. (R. at 393.) After

reviewing a May 2007 MRI of Plaintiff, Dr. Maximous noted that Plaintiff had mild degenerative

disc disease with mild facet osteoarthritis without stenosis at L4-L5, and that she had no

herniation. (R. at 393.) Dr. Maximous opined that Plaintiff had minimal arthritis in her lower

back, and he recommended over-the-counter medications. (R. at 393.) He further advised her to continue with her activities. (R. at 393.)

Plaintiff underwent an MRI of her cervical spine on August 22, 2008. (R. at 469.) The MRI revealed mostly normal findings for Plaintiff's upper spine. (R. at 469.) There was evidence of minimal degenerative disc disease changes in Plaintiff's mid and lower cervical spine without any focal compromising abnormality. (R. at 469.)

On August 27, 2008, Dr. Salazar reported that Plaintiff had generalized tenderness on palpitation of her shoulders and arms in addition to pain on palpitation over both of her SI joints. (R. at 445.) Dr. Salazar also indicated that Plaintiff's lumbosacral spine MRI was unremarkable and that there was no clear radicular pain distribution during her examination. (R. at 445.) On September 30, 2008, Dr. Salazar reported that Plaintiff had normal sensation, reflexes, gait, muscle strength and muscle tone. (R. at 442.)

On October 1, 2008, Plaintiff visited Dr. Manhal Saleeby, M.D., for pain management. (R. at 404.) Dr. Saleeby reported that Plaintiff walked without the use of assistive devices and did not display an antalgic gait. (R. at 405.) Plaintiff demonstrated a positive straight leg-raise at about sixty degrees on her right side, a negative straight leg-raise on her left side, tenderness with moderate muscle spasm on her right, some lumbar thoracic tenderness mostly on her right side, normal lumbar spine extension and flexion, no motor or sensory defects and normal reflexes. (R. at 405.) Furthermore, an MRI indicated degenerative disc disease and facet anthropathy at multiple levels. (R. at 405.) Dr. Saleeby opined that overall the MRI was "unremarkable." (R. at 405.) Dr. Saleeby did not prescribe Plaintiff any medication and he recommended that Plaintiff "remain as active as possible," use heat to manage any pain and

5

perform stretching exercises. (R. at 405.) Dr. Saleeby advised that Plaintiff should have a selective nerve block procedure, which Plaintiff underwent on December 4, 2008. (R. at 405, 765.)

On October 7, 2008, a CT scan of Plaintiff's pelvis revealed mild degenerative changes without acute bony abnormality in Plaintiff's spine. (R. at 463.) The scan showed no evidence of any significant sclerosis in Plaintiff's right iliac bone. (R. at 463.) On October 17, 2008, Dr. Salazar reported that Plaintiff displayed tenderness on palpitation of the mid cervical paraspinal muscles on her left side. (R. at 439.) Plaintiff exhibited normal sensation, reflexes, gait, muscle strength and muscle tone. (R. at 439.) Dr. Salazar also "could not find a neurological cause for her pain on the right leg." (R. at 439.)

Plaintiff underwent a selective nerve block procedure on December 4, 2008. (R. at 765.) On December 10, 2008, during a follow-up to the nerve block procedure, Dr. Saleeby reported that Plaintiff had tenderness and multiple trigger points, sensitive to touch, in her right thoracic and lumbar paraspinal muscle areas. (R. at 751.) Plaintiff also had tender trigger points in her deltoid andtrapezius muscles on the right. (R. at 751.) Dr. Saleeby otherwise reported "no acute changes." (R. at 751.) Dr. Saleeby opined that Plaintiff may suffer from myofascial pain syndrome, spasms of the muscles, degenerative disc disease of the lumbar spine and scoliosis. (R. at 751.)

On January 12, 2009, Plaintiff visited Dr. Saleeby for a follow-up visit. (R. at 750.) Dr. Saleeby reported that Plaintiff had trigger points on her right lumbar paraspinal muscles. (R. at 750.) He noted that Plaintiff showed extension and flexion within the normal range. (R. at 750.) Plaintiff walked without assistive devices and showed no acute antalgic gait. (R. at 750.) Dr.

Saleeby opined that Plaintiff had myofascial pain syndrome, spasms of the muscles, degenerative disc disease of the lumbar spine and lower back pain that was musculoskeletal in nature. (R. at 750.) Dr. Saleeby recommended some prescription medication for Plaintiff and also advised that she "[c]ontinue to remain as active as possible." (R. at 750.)

On February 1, 2009, Plaintiff went to the emergency room complaining of neck pain exacerbated by movement. (R. at 570.) Upon examination, Plaintiff's neck was normal to inspection and supple, she had neither a motor nor sensory deficit and her extremities were within the normal range of motion and non-tender. (R. at 571.) The preliminary radiology report indicated "no definite evidence of displaced cervical fracture or dislocation." (R. at 577.) The final radiology report for this emergency room visit "demonstrate[d] normal height and alignment of all seven cervical vertebral bodies." (R. at 580.) The final impression of the report was that Plaintiff had a "normal cervical spine." (R. at 580.)

On February 9, 2009, Dr. Salazar noted that Plaintiff had tenderness on palpitation of her cervical paraspinal muscles. (R. at 436.) Dr. Salazar further reported that Plaintiff had normal sensation, reflexes, gait, muscle strength and muscle tone. (R. at 436.) Dr. Salazar also opined that Plaintiff appeared to have myofascial pain and that thyroid disease could be responsible for her pain. (R. at 436.)

On February 11, 2009, Dr. Saleeby saw Plaintiff for a follow-up visit. (R. at 749.) During this examination, Plaintiff continued to complain of neck and lower back pain. (R. at 749.) Plaintiff walked without using assistive devices and exhibited a normal affect. (R. at 749.) Other than some tenderness on Plaintiff's cervical paraspinal area, there were no acute changes. (R. at 750.)

7

On May 14, 2009, Dr. Salazar noted that Plaintiff had tenderness on palpitation of her cervical paraspinal muscles. (R. at 433.) Plaintiff had normal sensation, reflexes, gait, muscle strength and muscle tone. (R. at 433.) Dr. Salazar also opined that Plaintiff's pain was possibly a result of myofascial pain syndrome or thyroid disease. (R. at 433.) Dr. Salazar noted that he could not find "a primary neurological problem." (R. at 433.)

On August 5, 2009, Dr. Saleeby reported that Plaintiff's extension of her cervical spine was limited with tenderness. (R. at 746.) Plaintiff had diminished deep tendon reflexes in her bilateral biceps and triceps. (R. at 746.) Plaintiff demonstrated good muscle strength in her bilateral upper extremities and had no sensory defects. (R. at 746.) Dr. Saleeby noted that Plaintiff did not use assistive devices and walked with no acute antalgic gait. (R. at 746.) An MRI showed mild degenerative disc disease of the cervical spine. (R. at 746.)

On August 26, 2009, an MRI of Plaintiff's cervical spine showed minimal or mild degenerative disc disease at C3-C4, C4-C5 and C5-C6 with minimal disc bulge and minimal endplate osteophytosis. (R. at 735.) The report consistently noted that the findings of degenerative disc disease were either mild or minimal. (R. at 734.) The MRI also indicated type one and type two sclerosis at the superior endplate of C5; however, Plaintiff had only minimal loss of height due to mild spondylosis. (R. at 735.) The MRI showed neither dominant disc herniation nor significant central canal stenosis at any level. (R. at 735.) Furthermore, the MRI indicated that the neural foramina appeared to be normally patent at all levels without demonstrable stenosis. (R. at 735.) Additionally, Plaintiff's cervical spinal cord appeared normal without any evidence of focal myelomalacia. (R. at 735.)

On September 2, 2009, and again on September 18, 2009, Dr. Saleeby noted that Plaintiff walked with no acute antalgic gait and without an assistive device. (R. at 744-45.) On September 2, 2009, Dr. Saleeby reported that Plaintiff displayed tenderness to cervical pressure. (R. at 745.) Plaintiff had a normal range of extension/flexion, right and left rotation and tilt of the cervical spine. (R. at 745.) Plaintiff also had good muscle strength and no sensory defects. (R. at 745.)

On September 8, 2009, Dr. Saleeby administered a cervical epidural steroid injection to Plaintiff. (R. at 754.) During a follow-up on September 18, 2009, Plaintiff reported to Dr. Saleeby that she did not see any significant difference following the steroid injection. (R. at 744.) Plaintiff walked without an acute antalgic gait and without an assistive device. (R. at 744.) Plaintiff had some tenderness on her thoracic paraspinal area without tender points. (R. at 744.) Furthermore, the extension/flexion of Plaintiff's cervical spine was within normal range. (R. at 744.) Dr. Saleeby discontinued Plaintiff's use of Percocet and advised that she "learn pain coping skills and relation techniques." (R. at 744.) Dr. Saleeby further advised Plaintiff that "she needs to walk, stretch, and exercise." (R. at 744.)

On November 30, 2009, Dr. Saleeby again indicated that Plaintiff walked without the use of assistive devices and without an acute antalgic gait. (R. at 743.) Plaintiff did not display any sensory deficits. (R. at 743.) Dr. Saleeby reported that Plaintiff had tender points in her back and on her knee, but otherwise had good muscle strength in her upper extremities. (R. at 743.)

On January 12, 2010, Plaintiff hit a deer while driving. (R. at 770.) During an examination on January 29, 2010, Dr. Saleeby reported that aggravated musculoskeletal pain in Plaintiff's thoracic spinal area was related to the collision. (R. at 770.) During this examination,

Plaintiff walked with no acute antalgic gait and without the use of an assistive device. (R. at 770.) Plaintiff displayed good muscle strength in her bilateral upper extremities and did not show signs of sensory deficits. (R. at 770.)

On February 22, 2010, Dr. Saleeby reported that Plaintiff had trigger points in her right major dorsal muscles with muscle spasms. (R. at 768.) Plaintiff also experienced tenderness to pressure on her cervical paraspinal area. (R. at 768.) Plaintiff indicated that the cervical epidural administered in September 2009 had helped with her pain until mid-February 2010. (R. at 768.) Dr. Saleeby, therefore, administered another cervical epidural steroid injection on March 2, 2010. (R. at 768, 786.)

On April 14, 2010, Plaintiff displayed limited extension/flexion of her cervical spine with tenderness. (R. at 834.) She had tenderness to pressure with muscle spasm on her lumbar paraspinal area. (R. at 834.) Plaintiff did not use assistive devices, walked without an acute antalgic gait, had good muscle strength in her bilateral upper extremities and had no sensory deficits. (R. at 834.) Dr. Saleeby advised Plaintiff "to learn pain coping skills and relaxation techniques" and "to remain as active as possible." (R. at 834-35.)

During Plaintiff's appointment on June 14, 2010, Plaintiff had tenderness to pressure on her cervical paraspinal area. (R. at 832.) Dr. Saleeby reported Plaintiff did not use assistive devices, walked without an acute antalgic gait, had good muscle strength in both her bilateral upper and bilateral lower extremities and had no sensory deficits. (R. at 832.) Dr. Saleeby advised Plaintiff "to remain as active as possible." (R. at 833.)

On July 30, 2010, Plaintiff had tenderness in her cervical spine and multiple tender points in her extremities. (R. at 831.) Plaintiff did not use assistive devices and walked without an

10

acute antalgic gait. (R. at 831.) Plaintiff demonstrated normal shoulder range of motion, normal reflexes and no sensory deficits. (R. at 831.) Subsequently, on September 27, 2010, and November 19, 2010, Dr. Saleeby reported no changes upon physical examination of Plaintiff. (R. at 856-57.)

On September 8, 2010, December 16, 2010, and March 17, 2011, Dr. Rekha Nugaram, M.D., reported that Plaintiff had normal musculoskeletal and neck ranges of motion in addition to normal reflexes. (R. at 861, 864, 916.)

On January 25, 2011, Dr. Gurpal Bhuller, M.D., examined Plaintiff for hip pain. (R. at 865.) Dr. Bhuller reported that Plaintiff had mild tenderness in her shoulders and hips, but otherwise had a full range of motion. (R. at 865.) Furthermore, Plaintiff demonstrated full knee flexion and extension. (R. at 865.) Dr. Bhuller administered a hip injection and advised Plaintiff to follow-up with Dr. Saleeby for pain management. (R. at 866.)

On April 20, 2011, Dr. David Nodeff, M.D., examined Plaintiff for knee pain. (R. at 891.) Dr. Nodeff reported that Plaintiff had normal knee stability, full left lower extremity strength, normal reflexes and no pain with hip range of motion. (R. at 891.) Overall, Dr. Nodeff reported that the examination was "essentially normal." (R. at 891.)

On July 6, 2011, Plaintiff visited Community Memorial Healthcare, complaining of generalized pain after falling down the stairs. (R. at 919.) Upon arrival at Community Memorial, Plaintiff walked without assistance and demonstrated no problems with movement. (R. at 919, 921.) Plaintiff demonstrated normal ranges of motion in her neck, back and extremities. (R. at 921.) Plaintiff had no evidence of spinal tenderness or extremity focal

11

tenderness, deformity or weakness. (R. at 921.)  Plaintiff showed intact motor and sensory

functions. (R. at 921.)

Plaintiff also offers new evidence, unavailable to the ALJ, in the form of an opinion letter

from Dr. Saleeby dated July 29, 2013. (ECF No. 13-2.)  In this letter, Dr. Saleeby indicated that

he had been treating Plaintiff for several years and had diagnosed her with fibromyalgia

syndrome and severe spinal stenosis of the cervical spine. (ECF No. 13-2.)  Dr. Saleeby further

opined that Plaintiff's future capacity for work is limited due to her pain. (ECF No. 13-2.)

C.  Plaintiff's Mental Disorders

During a physical examination on June 13, 2007, Dr. Nunley indicated that Plaintiff was

oriented with normal mood and affect. (R. at 388.)  Likewise, during examinations on July 9,

2008, August 8, 2008, August 27, 2008, September 30, 2008, October 17, 2008, February 9,

2009, and May 14, 2009, Dr. Salazar noted that Plaintiff was oriented with normal memory,

attention, language, knowledge and affect. (R. at 433, 436, 439, 442, 445, 448, 451, 739, 741.)

On September 3, 2008, Plaintiff visited psychologist J. Michael Griffin, Ph.D,

complaining of being "depressed, stressed, [and] on-edge." (R. at 415.)  This visit was Plaintiff's

third to Dr. Griffin's practice since 2004. (R. at 415.)  Plaintiff reported poor sleep habits, poor

appetite, low energy, crying spells, anhedonia and low libido. (R. at 415.)  Plaintiff reported no

past mental health treatments or hospitalizations. (R. at 415.)  During an October 1, 2008, visit

to Dr. Saleeby, Plaintiff was alert, oriented and pleasant, and she also had normal judgment. (R.

at 405.)

On October 21, 2008, Dr. Griffin indicated that Plaintiff had dysphoric mood and

constricted affect. (R. at 411.)  He also reported that she was alert, attentive and coherent, and

12

that she had excellent grooming, appropriate dress, a cooperative attitude and intact sensorium. (R. at 411.)

On November 4, 2008, Dr. Griffin opined that Plaintiff's depression appeared to be chronic. (R. at 410.) Dr. Griffin indicated that Plaintiff's depression could be related to her chronic pain. (R. at 410.) Plaintiff missed follow-up visits with Dr. Griffin on November 18, 2008, and December 1, 2008. (R. at 408-09.)

On January 15, 2009, Dr. Griffin noted that Plaintiff complained of pain, but indicated that she currently had no risk factors. (R. at 691.) On February 10, 2009, Dr. Griffin noted that Plaintiff seemed disoriented, but indicated that Plaintiff currently had no risk factors. (R. at 692.) On April 27, 2009, Plaintiff reported poor sleep habits, poor appetite, weight loss, low energy, crying spells, anhedonia and anxiety. (R. at 689.) Dr. Griffin indicated that Plaintiff had no risk factors. (R. at 689.) During this session, Dr. Griffin facilitated discussion and exploration of Plaintiff's physical treatments. (R. at 689.)

On June 29, 2009, Dr. Griffin indicated that Plaintiff had no risk factors. (R. at 687.) He also noted that Plaintiff's progress was mildly better. (R. at 687.) During this session, Dr. Griffin facilitated discussion of Plaintiff's physical treatments. (R. at 687.)

On August 6, 2009, Plaintiff complained of anhedonia, anxiety and irritability. (R. at 685.) Dr. Griffin discussed Plaintiff's pain and encouraged her to continue following Dr. Saleeby's pain management orders. (R. at 685.) Dr. Griffin reported no risk factors. (R. at 685.) On August 27, 2009, Plaintiff discussed a recent MRI and her physical pain with Dr. Griffin. (R. at 684.) Dr. Griffin noted that Plaintiff had no risk factors. (R. at 684.)

13

On September 10, 2009, Plaintiff reported poor sleep habits, poor appetite, low energy, crying spells, anhedonia, irritability and mood/anxiety. (R. at 683.) Dr. Griffin discussed Plaintiff's physical ailments and noted that she had no risk factors. (R. at 683.) On September 24, 2009, Plaintiff complained of poor appetite, weight loss and low energy. (R. at 682.) Dr. Griffin reported no risk factors, and he advised Plaintiff to be as active as possible and to stop smoking. (R. at 682.) On November 16, 2009, Plaintiff complained of poor sleep, poor appetite, low energy, anhedonia, mood/anxiety and irritability. (R. at 680.) Dr. Griffin reported no risk factors and discussed Plaintiff's physical impairments. (R. at 680.)

In a progress note dated December 1, 2010, Dr. Griffin noted that Plaintiff had been "up and about" for two days and that she had attended her daughter's individual education plan meeting. (R. at 708.) On January 12, 2010, Dr. Griffin reported that Plaintiff had no risk factors. (R. at 850.) He noted that Plaintiff complained of poor sleep, poor appetite, low energy, anhedonia and mood/anxiety. (R. at 850.) During this session, Dr. Griffin discussed Plaintiff's physical pain and medications. (R. at 850.) Dr. Griffin recorded largely similar findings in progress notes from February 20, 2010, through May 11, 2011. (R. at 836-47, 868-79.)

On December 1, 2009, Dr. Griffin completed a Mental Status Evaluation Form for the Virginia Disability Determination Services ("DDS"). (R. at 701-06.) Dr. Griffin reported that Plaintiff socially isolated herself and complained of lack of sleep, appetite, energy, pain or dysfunction at each session. (R. at 702.) Plaintiff performed light housework and cooked minimally. (R. at 702.) Plaintiff always appeared depressed and physically stiff and would "grimace as if in pain." (R. at 703.) Dr. Griffin noted that Plaintiff had a depressed mood. (R. at 703.) During their sessions, Plaintiff was a good historian and cooperative, and she had "ok"

14

orientation. (R. at 703.) Dr. Griffin also noted that Plaintiff showed no suicidal ideation/attempts, delusions, hallucinations or confusion. (R. at 703.) Furthermore, Dr. Griffin estimated Plaintiff's memory, thought content and organization to be normal. (R. at 703.) Dr. Griffin also noted that Plaintiff had "likely poor" persistence and task completion, but fair attention span and concentration, an "ok" ability to perform calculations or abstract reasoning, "ok" judgment and a fund of information consistent with her age and education level. (R. at 704.) Dr. Griffin further opined that Plaintiff would "probably" experience a deterioration of adaptive behaviors under the daily stress of work. (R. at 704.) Dr. Griffin estimated that Plaintiff had an average IQ and average literary skills, and that she could, and did, manage her own funds. (R. at 704-05.) On June 3, 2010, Dr. Griffin completed another Mental Status Evaluation Form for DDS. (R. at 816-20.) Dr. Griffin provided answers on this form consistent with those that he provided on December 1, 2009. (R. at 816-20.)

On September 8, 2010, Dr. Nugaram reported that Plaintiff appeared well-developed and well-nourished, and that she was oriented to person, place and time. (R. at 861.) Dr. Nugaram further noted that Plaintiff had a normal mood and effect. (R. at 861.)

Plaintiff also offers new evidence, unavailable to the ALJ, in the form of an opinion letter from Dr. Griffin dated July 24, 2013. (ECF No. 13-1.) In this letter, Dr. Griffin indicated that he had treated Plaintiff for many years. (ECF No. 13-1.) Dr. Griffin noted that Plaintiff continually complained of medical problems and depression, and that she presented with a depressed mood and congruent affect. (ECF No. 13-1.) Dr. Griffin opined that Plaintiff had a history of chronic depression, secondary to chronic pain. (ECF No. 13-1.)

D.  Non-Treating State Agency Physician's Opinion

15

1. Plaintiff's Physical Disorders

On November 24, 2009, a state agency physician, Dr. James Darden, M.D., opined that Plaintiff had the ability to lift or carry twenty pounds occasionally, lift or carry ten pounds frequently, stand, walk or sit for about six hours in an eight-hour workday. (R. at 80.) He further indicated that Plaintiff had an unlimited ability to push or pull, as well as the ability to occasionally climb ramps or stairs, stoop, kneel, crouch or crawl. (R. at 80.) Plaintiff could frequently balance, though she could never climb ladders, ropes or scaffolds. (R. at 80.) Dr. Darden reported that Plaintiff had no manipulative, visual, communicative or environmental limitations. (R. at 80-81.) On June 30, 2010, a state agency physician, Dr. Tony Constant, M.D., reported the same findings as Dr. Darden. (R. at 106-07.)

2. Plaintiff's Mental Disorders

On November 23, 2009, a state agency psychologist, Leslie Montgomery, Ph.D., reported that Plaintiff had mild restrictions on her activities of daily living and mild difficulties in maintaining concentration, persistence or pace. (R. at 78.) Dr. Montgomery also noted that Plaintiff had neither difficulties in maintaining social functioning, nor repeated episodes of decompensation of extended duration. (R. at 78.) Noting that evidence also did not establish the presence of "Section C" criteria, Dr. Montgomery opined that Plaintiff did not meet the requirements of listing 12.04. (R. at 78-79.)

On June 30, 2010, Linda Dougherty, Ph.D., a state agency psychologist, reported that Plaintiff had mild restrictions on her activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (R. at 104.) Dr. Dougherty also noted that Plaintiff did not have repeated episodes of

16

decompensation of extended duration.  (R. at 104.)  Noting that evidence also did not establish

the presence of "Section C" criteria, Dr. Dougherty opined that Plaintiff did not meet the

requirements of listing 12.04.  (R. at 104.)  Dr. Dougherty further indicated that Plaintiff could

follow very short and simple instructions, would not require special supervision to sustain a work

routine and would be able to meet the basic mental demands of competitive work on a regular

basis despite her impairments.  (R. at 107-08.)

E.  Plaintiff's Activities of Daily Living

Plaintiff reported that she took care of her daughter, prepared meals three to five times

per week, did laundry, cleaned her bathroom and bedroom, and did not need help or reminders to

take her medicine.  (R. at 305-06, 328-29, 743.)  Plaintiff could also go out alone, drive, ride in a

car and take public transportation.  (R. at 307, 330.)  Plaintiff could handle her own finances and

go out to shop in stores.  (R. at 307, 330, 361.)  Plaintiff further reported that she got along with

her daughter's teachers and that she had never been fired from a job because of problems getting

along with others.  (R. at 310, 333.)

F.  Plaintiff's Testimony Before the ALJ

During the hearing before the ALJ, Plaintiff testified that she usually experienced pain at

a level of seven or eight on a scale from one to ten.  (R. at 45.)  She also indicated that she took a

number of medications to help manage her physical impairments.  (R. at 41-44.).  Plaintiff

testified that she was involved in managing her daughter's education by signing off on her

daughter's individual education plan.  (R. at 45.)  Plaintiff also stated that she was able to drive

herself to her doctor's appointments.  (R. at 46.)  Plaintiff further testified that she usually spent

her days at home, but that she would leave the house roughly three days per week.  (R. at 48.)

17

## II. PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI on July 28, 2009, alleging disability due to degenerative disc disease, arthritis, a pinched nerve, bursitis in her hip, chronic obstructive pulmonary disorder, sleep apnea, thyroid disease and depression with an alleged onset date of May 20, 2007. (R. at 74-75, 84-85, 214, 220, 266.) DDS initially denied Plaintiff's application for benefits on November 24, 2009, and again on reconsideration on June 30, 2010. (R. at 82, 92, 110-11, 126-27, 133-35, 140-42, 150-52, 154-63.) Following Plaintiff's request, an ALJ held a hearing during which Plaintiff, represented by counsel, and a Vocational Expert testified. (R. at 30-73.)

On August 26, 2011, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 16-29.) Although the ALJ found that Plaintiff had the severe impairments of mild degenerative disc disease, lumbar and cervical radiculopathy, fibromyalgia and a depressive disorder, the ALJ determined that none of these impairments met or equaled listing level severity. (R. at 18-19.) Specifically, the ALJ found that Plaintiff failed to meet the criteria for listing §§ 1.04 and 12.04. (R. at 19-21.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-4.)

### III. Questions Presented

1. Does Plaintiff's new evidence warrant a remand?

2. Did substantial evidence support the ALJ's determination that Plaintiff's physical impairments did not meet or equal the criteria of listing § 1.04?

3. Did substantial evidence support the ALJ's determination that Plaintiff's mental impairments did not meet or equal the criteria of listing § 12.04?

4.  Did substantial evidence support the ALJ's determination that Plaintiff's treating physicians' opinions were entitled to less than controlling weight?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial

19

evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). For a claimant's impairment to meet or equal a

20

listed impairment, the claimant must show that all of a listing's criteria have been met. 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If the claimant fails to show that her impairments meet all of the listed criteria, that impairment, "no matter how severe[], does not qualify." *Zebley*, 493 U.S. at 530.

The claimant is not required "to show that the symptoms [are] present simultaneously . . . or in close proximity to one another." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Moreover, when a medical record is ambivalent or includes evidence supportive of a claim, the ALJ must do more than summarily conclude that a claimant's impairment does not meet or equal a listed impairment. *Id.* The ALJ must provide a legal analysis that is sufficient "for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.*

If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work based on an assessment of the claimant's residual functional capacity ("RFC") and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work

experience and RFC, the claimant is capable of performing other work that is available in

significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v.*

*Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Bowen*, 482 U.S. at 146 n.5). The Commissioner

can carry his burden in the final step with the testimony of a VE. When a VE is called to testify,

the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC

based on all evidence on record and a fair description of all of the claimant's impairments, so

that the VE can offer testimony about any jobs existing in the national economy that the claimant

can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical

posed represents all of the claimant's substantiated impairments will the testimony of the VE be

"relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the

claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R.

§§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

### A. The ALJ's Decision

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity

since May 20, 2007. (R. at 18.) At step two, the ALJ determined that Plaintiff was severely

impaired from mild degenerative disc disease of the lumbar spine, lumbar and cervical

radiculopathy, fibromyalgia and a depressive disorder. (R. at 18.)

Despite finding at step two that Plaintiff's impairments were severe, at step three, the

ALJ determined that none of Plaintiff's impairments met the listing requirements of 20 C.F.R. pt.

404, subpt. P, app. 1. (R. at 19-21.) Following a careful consideration of the record, the ALJ

specifically found that Plaintiff's impairments did not meet or equal the requirements for listing § 1.04 or listing § 12.04. (R. at 19-21.)

Next, the ALJ determined that Plaintiff had the RFC to perform a range of light work with some postural and instructional limitations. (R. at 22.) In doing so, the ALJ considered Plaintiff's testimony, other evidence submitted at the hearing, objective medical evidence and the opinions of state agency consultants. (R. at 22-27.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform her past relevant work as a corrections officer, insurance agent, restaurant manager or assistant manager of a retail store. (R. at 27.) At step five, after considering Plaintiff's age, education, work experience and RFC, and after consulting a VE, the ALJ found that occupations existed in significant numbers in the national economy that Plaintiff could perform. (R. at 27-28.) Specifically, the ALJ found that Plaintiff, regardless of her impairments, could work as a small parts assembler, a general office helper or a routing clerk. (R. at 28.) Therefore, the ALJ concluded that Plaintiff was not disabled and that she was not entitled to benefits. (R. at 28-29.)

Plaintiff essentially argues that the ALJ erred in determining that Plaintiff's impairments do not meet or equal the listings in 20 C.F.R. pt. 404, subpt. P, app. 1. (Pl.'s Mem. at 1.) Plaintiff offers new evidence to support her argument that her impairments are of listing level severity. (Pl.'s Mem. at 1.) Plaintiff also argues that the opinions of the non-treating state agency physicians should be given little weight, because those physicians did not examine her in person. (Pl.'s Mem. at 3-4.) Defendant argues that Plaintiff failed to meet her burden of proving that her impairments were of listing-level severity. (Def.'s Mem. at 16, 20.) Defendant further argues that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 16, 20.)

B. Plaintiff's new evidence does not warrant a remand.

Plaintiff offers new evidence in the form of opinion letters from Dr. Saleeby (ECF No. 13-2.) and Dr. Griffin (ECF No. 13-1.) In his letter, Dr. Saleeby opines that Plaintiff's physical pain is genuine and that her prognosis to return to work is poor. (ECF No. 13-2.) Dr. Griffin indicates that Plaintiff has a history of chronic depression, secondary to her pain. (ECF No. 13-1.) Dr. Saleeby's letter is dated July 29, 2013, and Dr. Griffin's letter is dated July 24, 2013. Neither letter was available to the ALJ.

In determining whether the ALJ's decision was supported by substantial evidence, a district court may not consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714-15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1970)) (noting that reviewing courts are restricted to the administrative record in determining whether the decision is supported by substantial evidence). Although the Court may not consider evidence that was not presented to the ALJ, the Act provides that the Court may remand a case for reconsideration in two situations. 42 U.S.C. § 405(g). The first is a "sentence four" remand, which provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing. *Id.* The second is a "sentence six" remand, which provides that the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

24

A reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citations omitted). Because Plaintiff has offered new evidence to the Court, the Court will address whether Plaintiff has fulfilled the requirements to justify a sentence six remand.

Plaintiff meets the third and fourth requirements of *Borders* standard for a sentence six remand. 777 F.2d at 955. There is good cause for Plaintiff's failure to submit the evidence earlier simply because the report was completed after the ALJ's decision. Plaintiff has also made a general showing of the nature of the new evidence, as she has attached both letters to her motion.

However, neither letter constitutes new evidence that is relevant, non-cumulative and material that warrants a sentence six remand. New evidence must relate to the determination of disability *at the time the application was first filed*, and it must not concern evidence of a later-acquired disability, or of the "subsequent deterioration of the previously non-disabling condition." *Borders*, 777 F.2d at 955; *Szubak v. Sec'y of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984) (citing *Ward v. Schweiker*, 686 F.2d 762, 765 (9th Cir. 1982)). Evidence must also be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him. *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted).

25

The letters were completed in July, 2013, almost two years after the ALJ made her determination. While the letters do both opine as to the ongoing nature of Plaintiff's ailments over the past several years, both are cumulative. The record available to the ALJ already contained hundreds of pages of medical notes and reports from both Dr. Saleeby and Dr. Griffin. These reports included information on Plaintiff's medications, treatments, diagnoses and prognoses, in addition to both Doctors' opinions regarding Plaintiff's conditions. Therefore, the letters are "merely cumulative" and fail the first requirement of the *Borders* standard. Moreover, the letters fail the second *Borders* requirement of materiality. Given that the record was already replete with evidence of Plaintiff's impairments and the opinions of her doctors, the Commissioner's decision would not have been reasonably different had the new evidence been before her. Because this new evidence is cumulative and immaterial, it fails to meet the requirements of a sentence six remand.

C. Substantial evidence supports the ALJ's determination that Plaintiff's physical impairments do not meet or equal the criteria of listing § 1.04.

Plaintiff challenges the ALJ's determination that her impairments did not meet or equal the requirements of listing § 1.04. (Pl.'s Mem. at 1.) Defendant responds that substantial evidence supports the ALJ's determination. (Def.'s Mem. at 17.) The Court agrees with Defendant.

The listings are a regulatory tool that enables the government to make decisions more efficiently by identifying claimants whose impairments are so severe that they are presumptively disabled, regardless of their age, education and work history. 20 C.F.R § 404.1525(a); *Zebley*, 493 U.S. at 532. A plaintiff has the burden of proving that she meets or equals a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and consequently require an

26

exacting standard of proof. *Zebley*, 493 U.S. at 532-33. "For a claimant to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530. Furthermore, the determination as to whether Plaintiff's impairments meet or equal the listing requirements is reserved to the Commissioner alone. 20 C.F.R. § 404.1527(d)(2). The opinions of treating medical sources as to whether a Plaintiff's impairments meet or equal the listing requirements are not given any special significance. 20 C.F.R. § 404.1527(d)(3).

Listing § 1.04 requires:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., pt. 404, subpt. P, app. 1, § 1.04.

At step three, the ALJ must clearly set forth the reasons for his decisions. *Diaz v. Comm'r of Social Sec. Admin.*, 577 F.3d 500, 504 (3d Cir. 2009). "Conclusory statements that a

condition does not constitute the medical equivalent of a listed impairment are insufficient." *Id.* In conducting his analysis, the ALJ should identify the relevant listed impairments and then compare the criteria of each listing with evidence of Plaintiff's symptoms. *Cook v. Heckler,* 783 F. 2d 1168, 1173 (4th Cir. 1986); *Brascher v. Astrue*, 2011 WL 1637029, at *4-5 (E.D. Va. Mar. 11, 2011). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook,* 783 F.2d at 1173; *see also Radford*, 734F.3d at 295 (citing *Cook*, 783 F.2d at 1173) (noting that when an ALJ summarily concludes that a claimant's impairment does not meet a listed impairment, the ALJ has not made a sufficient legal analysis for the reviewing court to determine whether substantial evidence supports the ALJ's findings). However, if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination. *Smith v. Astrue*, 457 Fed. App'x 326, 328 (4th Cir. 2000) (citing *Fisher-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005)). The ALJ need only review the medical evidence once in the opinion to analyze Plaintiff's condition. *McCartney v. Apfel*, 28 Fed. App'x 277, 279 (4th Cir. 2002). So long as the ALJ does not "fail[] to adequately explain his reasoning[,]" the district court is able to undertake the "meaningful review" required for a finding that Plaintiff's conditions do not meet or equal the listed impairments. *Radford,* 734F.3d at 296 (citing *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (internal quotation marks omitted).

Defendant correctly notes that, as an initial matter, Plaintiff cannot satisfy either the B or C criteria of listing § 1.04, because Plaintiff did not present evidence of spinal arachnoiditis or pseudoclaudication resulting in the inability to ambulate effectively. A review of the record

28

reveals no diagnosis of spinal arachnoiditis, and the ALJ noted that Plaintiff walked without an

antalgic gait and without an assistive device.  (R. at 24.)

Turning to the criteria for listing 1.04(A), substantial evidence supports the ALJ's

determination that medical evidence did not substantiate the claim of nerve root compression as

described in the regulations.  (R. at 20.)  Specifically, Plaintiff had a normal range of motion and

did not have the motor, sensory or reflex deficits as required by listing section 1.04(A).  (R. at

389, 393, 400, 405, 571-72, 656, 743-46, 750, 770-71, 834, 919, 921.)

Dr. Saleeby's medical reports show that Plaintiff cannot satisfy the requirements of

listing § 1.04(A).  On October 1, 2008, Dr. Saleeby noted that Plaintiff had no motor or sensory

deficits, and that she had normal lumbar spine extension and flexion.  (R. at 405.)  In January,

2009, Dr. Saleeby again reported that Plaintiff had normal extension and flexion.  (R. at 750.)

On August 5, 2009, Dr. Saleeby indicated that Plaintiff's cervical spine movement was limited

by tenderness; however, he also reported that Plaintiff had no sensory deficit.  (R. at 746.)

Again, on September 2, 2009, Plaintiff had a normal range of extension, flexion, rotation and tilt

of the cervical spine, no sensory deficits and good muscle strength.  (R. at 745.)  Dr. Saleeby

again reported normal range extension and flexion of the cervical spine on September 18, 2009.

(R. at 744.)  He further specifically advised Plaintiff to "walk, stretch, and exercise."  (R. at 744.)

In November 2009 and January 2010, Dr. Saleeby noted that Plaintiff had no sensory deficits and

that she had good muscle strength in her upper extremities.  (R. at 743, 770-71.)  While Dr.

Saleeby noted that Plaintiff's cervical spine extension and flexion were limited by tenderness on

April 14, 2010, he reported that Plaintiff nevertheless had good upper extremity muscle strength

and no sensory deficits.  (R. at 834.)

Further evidence in the record supports the ALJ's determination that Plaintiff did not satisfy the requirements for listing 1.04(A).  Medical records from June 2007 show that Plaintiff had no motor or sensory deficits, as well as no weakness or wasting in her extremities.  (R. at 389, 400.)  Emergency room records dated December 17, 2007, indicate that Plaintiff had a negative straight leg-raise, painless range of motion in her back and full range of motion in her extremities.  (R. at 656.)  On August 21, 2008, Dr. Maximous noted that Plaintiff could perform a straight leg-raise and that she did not have any motor or sensory deficits in her lower extremities.  (R. at 393.)  Emergency room records dated February 1, 2009, indicate that Plaintiff had no motor or sensory deficits, and that she had a normal range of motion in her extremities.  (R. at 571-72.)  Further emergency room records from July 6, 2011, show that Plaintiff had normal ranges of motion in her neck, back and extremities, as well as intact motor and sensory functions.  (R. at 919, 921.)  Overall, numerous sources in the record document that Plaintiff did not have the limitation of spinal motion or motor loss accompanied by sensory or reflex loss required by listing § 1.04(A).

Because Plaintiff demonstrated no evidence of spinal arachnoiditis, pseudoclaudication or a limitation of the spine or motor loss accompanied by sensory or reflex loss, substantial evidence supports the ALJ's determination that Plaintiff did not satisfy the requirements of listing § 1.04.

D. Substantial evidence supports the ALJ's determination that Plaintiff's physical impairments do not meet or equal the criteria of listing § 12.04.

Plaintiff challenges the ALJ's determination that her impairments did not meet or equal the requirements of listing § 12.04.  (Pl.'s Mem. at 1.)  Defendant responds that substantial evidence supports the ALJ's determination.  (Def.'s Mem. at 20.)  The Court agrees with Defendant.

As discussed above, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.  Furthermore, the determination whether Plaintiff's impairments meet or equal the listing requirements is reserved to the Commissioner alone. 20 C.F.R. § 404.1527(d)(2).  The opinions of treating medical sources as to whether a Plaintiff's impairments meet or equal the listing requirements are not given any special significance. 20 C.F.R. § 404.1527(d)(3).

Listing § 12.04 requires that a Plaintiff first medically substantiate the presence of one of the classes of mental disorders (the "A Criteria"). 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.04(A).  Next, § 12.04 requires that Plaintiff show that she experiences either more than two elements of certain impairment-related functional criteria (the "B Criteria"), or that she has more than a minimal limitation to do basic work activities with symptoms characterized by repeated episodes of decompensation of extended duration, predicted decompensation in the event of a minimal increase in mental demands or change in environment or the inability to function outside of a highly supportive living arrangement (the "C Criteria"). 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.04(B), (C).  To satisfy the B Criteria, Plaintiff must show two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or, repeated episodes of decompensation, each of extended duration. 20 C.F.R., pt. 404, subpt. P, app. 1, § 12.04(B).  The ALJ found that Plaintiff's impairments do not meet or equal listing § 12.04, because Plaintiff's conditions failed to satisfy either the B or C Criteria. (R. at 20-21.)

Substantial evidence supports the ALJ's determination that Plaintiff's mental impairments do not meet the requirements of listing § 12.04.  The ALJ began by noting that

Plaintiff's "depression may have been associated with signs and findings meeting the 'A' criteria for section 12.04;" however, she ultimately found that Plaintiff had failed to show that she satisfied the requirements of the B and C Criteria. (R. at 20-21.)

Addressing the B Criteria, the ALJ found that Plaintiff had only mild, rather than marked restrictions in her activities of daily living. (R. at 20.) Substantial evidence supports the ALJ's decision. Plaintiff was able to drive herself and take public transportation without assistance. (R. at 307, 330.) Moreover, Plaintiff reported that she prepared meals several times per week and shopped in stores two to three times per month. (R. at 306-07.)

Similarly, the ALJ found that, at most, Plaintiff had only moderate, rather than marked, difficulties with social functioning. (R. at 20-21.) Substantial evidence supports the ALJ's decision. Plaintiff had no problems with authority figures and had never been fired from a job due to difficulty interacting with others. (R. at 310, 333.) Moreover, despite reports of irritable moods, Plaintiff had been described as cooperative and as a good historian. (R. at 703.)

The ALJ also found that Plaintiff had moderate, not marked, difficulties with concentration, persistence or pace. (R. at 21.) Substantial evidence supports the ALJ's decision. Although Plaintiff likely had poor persistence and task completion, she had fair attention and concentration. (R. at 704.) Furthermore, Plaintiff handled her own finances, did not need reminders to take her medications and could follow written instructions. (R. at 305-07, 328-30, 361, 704-05, 743.) Finally, no evidence indicates that Plaintiff has experienced extended episodes of decompensation. Because Plaintiff had not demonstrated that she had marked restrictions on her activities of daily living; marked difficulties with social interactions; marked difficulties with concentration, persistence or pace; or, extended episodes of decompensation, substantial evidence supports the ALJ's determination that Plaintiff did not satisfy the B Criteria.

Substantial evidence also supports the ALJ's determination that Plaintiff did not satisfy the C Criteria. (R. at 21.) The record shows that Plaintiff had never been hospitalized for psychiatric reasons. Moreover, Plaintiff shopped in stores, took care of her daughter, prepared meals, did laundry and was involved in coordinating her daughter's education. (R. at 305-08, 328-30, 361, 743.) Accordingly, the ALJ reasonably concluded that Plaintiff failed to satisfy the C Criteria of listing § 12.04.

Although the ALJ found that the Plaintiff's mental impairments were associated with the requirements of § 12.04(A), substantial evidence showed that Plaintiff failed to meet the requirements of either the B or the C Criteria. Therefore, because Plaintiff could not prove that she satisfied all of the relevant medical criteria, substantial evidence supports the ALJ's determination that Plaintiff's impairments did not meet or equal listing § 12.04.

E.  Substantial evidence supports the ALJ's determination that Plaintiff's treating physicians' opinions were entitled to less than controlling weight.

Plaintiff does not directly challenge the ALJ's assignment of weight to her treating physicians; however, she argues that the ALJ should have given greater weight to her treating physicians' opinions rather than to those of the state agency physicians. (Pl.'s Mem at 3.) Defendant argues that substantial evidence supports the ALJ's assignment of weight. (Def.'s Mem. at 18-20, 22-23.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions,

33

including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, the opinions of both treating physicians and "other medical sources," such as treating nurse practitioners, must be weighed using the factors in 20 C.F.R. § 404.1527. *See* SSR 06-3p. Moreover, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the individual opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the source's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

The ALJ is required to consider the following when evaluating a treating source's opinions: (1) the length of the treating source's relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(d)(2)-(6); SSR 06-3p. However, those same regulations specifically vest the ALJ — not the treating sources — with the authority to determine whether a claimant is disabled as that term is defined

by statute. 20 C.F.R. § 404.1527(e)(1).

Here, because the opinions of the Plaintiff's treating sources were either inconsistent with other evidence or lacking in support, the ALJ was forced to reconcile divergent opinions offered by treating sources and those offered by state agency physicians. Ultimately, the ALJ gave no weight to Dr. Saleeby's opinion, gave little weight to Dr. Griffin's opinion and generally adopted the state agency consultants' opinions. (R. at 20-21.) Substantial evidence supports the ALJ's findings.

1. Dr. Saleeby's opinion

On May 26, 2010, Dr. Saleeby checked that Plaintiff met the A criteria for the Act's listing § 1.04, "Disorders of the Spine." (R. at 807.) No objective medical records or documentation support this opinion. (R. at 807-08.) Indeed, Dr. Saleeby's own notes and reports show that Plaintiff cannot satisfy the requirements of listing § 1.04(A). As discussed above, from October 2008 to April 2010, Dr. Saleeby continually reported that Plaintiff had no motor or sensory deficits, that she had good muscle strength, and that she had normal lumbar spine extension and flexion. (R. at 405, 743, 744, 745, 746, 770-71, 834 .) Dr. Saleeby only noted a few occasions over two years that Plaintiff's spine movement was limited by tenderness. (R. at 746, 834.) Moreover, on September 18, 2009, Dr. Saleeby specifically advised Plaintiff to "walk, stretch, and exercise." (R. at 744.)

Additional evidence in the record supports the ALJ's determination to give no weight to Dr. Saleeby's opinion regarding listing § 1.04(A). An MRI dated May 31, 2007, primarily indicated mild findings. (R. at 398, 737, 810). Medical records from June 2007 show that Plaintiff had no motor or sensory deficits, as well as no weakness or wasting in her extremities. (R. at 389, 400.) On July 9, 2008, August 8, 2008, August 27, 2008, September 30, 2008,

35

October 17, 2008, February 9, 2009, and May 14, 2009, Dr. Salazar reported that Plaintiff had

normal sensation, as well as normal muscle strength and tone. (R. at 433, 436, 439, 445, 448,

451, 741.)  On August 21, 2008, Dr. Maximous noted that Plaintiff could perform a straight leg-

raise, and that she did not have any motor or sensory deficits in her lower extremities. (R. at

393.)  On September 8, 2010, December 16, 2010, and March 17, 2010, Dr. Nugaram noted that

Plaintiff had normal neck and musculoskeletal ranges of motion. (R. at 861, 864, 916.)

Moreover, emergency room records from December 17, 2007, show that Plaintiff had a

negative straight leg-raise test, a full range of motion in her extremities and a painless range of

motion in her back. (R. at 656.)  Emergency room records from February 1, 2009, indicate that

Plaintiff had no motor or sensory deficits, and that she had a normal range of motion in her

extremities. (R. at 571-72.)  Finally, emergency room records from July 6, 2011, show that

Plaintiff had normal ranges of motion in her neck, back and extremities, as well as intact motor

and sensory functions. (R. at 919, 921.)

Moreover, the regulations do not require the ALJ to give significant weight to Dr.

Saleeby's conclusory opinion that Plaintiff met the requirements of listing § 1.04(A). Rather, the

regulations clearly state that "[a] statement by a medical source that you are 'disabled' or 'unable

to work' does not mean that we will determine that you are disabled." 20 C.F.R.

§ 416.927(d)(1).  Medical professionals are qualified to make medical diagnoses and opine on

functional limitations; however, they are not competent to issue dispositive opinions on

Plaintiff's disability, such opinions are reserved to the Commissioner. 20 C.F.R. § 416.927(d).

2.  Dr. Griffin's opinion

On November 22, 2010, Dr. Griffin, at the request of Plaintiff's counsel, opined that

Plaintiff satisfied the criteria for listing § 12.04. (R. at 858-60.)  Specifically, Dr. Griffin opined

that Plaintiff satisfied the "Section A" criteria through a depressive syndrome characterized by anhedonia, sleep disturbance, decreased energy and difficulty in concentrating or thinking. (R. at 858-59.) Additionally, under the "Section B" heading, Dr. Griffin indicated that Plaintiff had marked restrictions in activities of daily living, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. (R. at 859-60.) Finally, under the "Section C" heading, Dr. Griffin indicated that Plaintiff had a current history of one or more years' inability to function outside of a highly supportive living arrangement, and that he believed that she had a continued need for such an arrangement. (R. at 860.)

The ALJ assigned Dr. Griffin's opinion little weight, because his assessment was "inconsistent with other substantial evidence of record." (R. at 21.) Substantial evidence supports the ALJ's determination.

On October 21, 2008, Dr. Griffin reported that Plaintiff was alert, attentive and coherent. (R. at 411.) Moreover, during that session, Plaintiff had excellent grooming, appropriate dress, cooperative attitude and intact sensorium. (R. at 411.) From July 2008 to May 2009, Dr. Salazar reported that Plaintiff was oriented with normal memory, attention, language, knowledge and affect. (R. at 433, 436, 439, 442, 445, 448, 451, 739, 741.) Moreover, Dr. Nugaram also indicated that Plaintiff displayed normal mood and affect on September 8, 2010, December 16, 2010, and March 17, 2011. (R. at 861, 864, 916.)

Furthermore, Plaintiff did not have a history of mental hospitalizations and her activities of daily living support the ALJ's determination. Plaintiff took care of her daughter, attended a meeting regarding her daughter's education plan, prepared meals, did laundry and cleaned her area of the house. (R. at 305-08, 328-30, 361, 743.) Considering Dr. Griffin's own treatment

37

notes, other medical evidence and Plaintiff's activities of daily living, substantial evidence in the record provides support for the ALJ's decision to give little weight to Dr. Griffin's opinion. (R. at 22.)

3. State agency consultants' opinions

The ALJ considered opinions of state agency medical and psychological consultants with regards to Plaintiff's RFC. (R. at 26-27.) To the extent these opinions were consistent with medical evidence of record, the ALJ generally adopted them. (R. at 26-27.) Substantial evidence supports the ALJ's decision.

During the course of her treatment, Plaintiff continually walked without using assistive devices and without an abnormal gait. (R. at 393, 403, 743-45, 749-50, 770, 831-32, 834, 919, 921.) Plaintiff had a full range of motion with only slight discomfort when she rotated her right hip, and Plaintiff did not have any motor or sensory deficits in her lower extremities. (R. at 389, 393, 400, 405, 571-72, 656, 743-46, 750, 770-71, 834, 919, 921.) Despite complaints of a high degree of pain, Plaintiff had been advised to stay as active as possible and to continue with her regular activities. (R. at 393, 405.)

Regarding her mental impairments, Plaintiff's attention and concentration were average. (R. at 704.) Her judgment was intact and her ability to perform calculations and abstract reasoning was "ok." (R. at 704.) Plaintiff experienced no delusions or hallucinations, and she had no record of suicidal ideations or attempts. (R. at 703.) Plaintiff demonstrated a cooperative attitude and her immediate, recent and remote memory was normal. (R. at 411, 703, 739, 741.) Plaintiff also reported that she had "no problem" following written instructions, and that she eventually adjusted to changes in routine. (R. at 332-33.) Plaintiff's psychologist also advised her to be as active as possible. (R. at 682.)

Plaintiff's activities of daily living further support the ALJ's decision to generally adopt the opinions of the state agency consultants. Plaintiff took care of her daughter, prepared meals three to five times per week, did laundry, cleaned her bathroom and bedroom, and did not need help or reminders to take her medicine. (R. at 305-06, 328-29, 743.) Plaintiff could also go out alone, drive, ride in a car and take public transportation. (R. at 307, 330.) Plaintiff could handle her own finances and go out to shop in stores. (R. at 307, 330, 361.) Depending on her mood, Plaintiff would socialize with her family and friends, and she would play cards two to three times per week. (R. at 331.) Plaintiff also got along with her daughter's teachers and had never been fired from a job because of problems getting along with others. (R. at 310, 333.)

Considering treatment notes, other medical evidence and Plaintiff's activities of daily living, substantial evidence in the record provides support for the ALJ's decision to generally adopt the state agency consultants' opinions. (R. at 26-27.)

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson, to all counsel of record, and to Plaintiff at her address of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of**

any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____  /s/

David J. Novak
United States Magistrate Judge

Date:  December 4, 2013
Richmond, Virginia